1ao6ussc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   U.S. SECURITIES AND EXCHANGE
    COMMISSION,
4
                Plaintiff,
5
            v.                              11 CIV 4204(MGC)
6
    EDWARD S. STEFFELIN,
7
                Defendant.
8
    ------------------------------x
9                                           New York, N.Y.
                                            October 25, 2011
10                                          12:00 noon

11  Before:

12                  HON. MIRIAM GOLDMAN CEDARBAUM,

13                                          District Judge

14                          APPEARANCES

15  US. SECURITIES AND EXCHANGE COMMISSION
        Attorneys for Plaintiff
16  BY:  JAN FOLENA
        ROBERT DODGE
17
    NIXON PEABODY, LLP
18      Attorneys for Defendant
    BY:  ALEX LIPMAN
19      EDWARD O'CALLAGHAN
        ASHLEY BAYNHAM
20

21

22

23

24

25

1ao6ussc

```
1          (In open court; case called)
2          THE COURT:  This is a motion to dismiss the complaint
3   on the ground that the complaint fails to state a claim on
4   which relief can be granted.
5          I will hear from the proponent of the motion
6          MR. LIPMAN:  Good afternoon, your Honor.  Alex Lipman
7   for Mr. Steffelin, and with me at counsel's table is Edward
8   O'Callaghan and Ashley Baynham.
9          THE COURT:  I did receive one motion from a pro hac
10  vice from a lawyer who is a member of the Bar of New York.  I
11  only admit as pro hac vice lawyers who are otherwise not
12  eligible to join the bar of this court.  It is a way of
13  permitting lawyers who are not qualified to appear before the
14  Court to appear for a particular cases.  Anybody who is
15  admitted to the Bar of New York should be moving for admission
16  for all purposes to the bar of this Court because you are
17  eligible to join the bar of this court.
18         MR. LIPMAN:  Thank you, your Honor.
19         THE COURT:  Pro hac vice is only for lawyers who are
20  not eligible to join this bar.
21         MR. LIPMAN:  Thank you, your Honor.  I am admitted for
22  all purposes.
23         THE COURT:  Yes, I know.  I am advising you since I am
24  treating you as a representative of the defendant.
25         MR. LIPMAN:  I appreciate that, your Honor.  Thank
```

1ao6ussc

```
 1    you.

 2              Your Honor, what I would like to do if it suits your

 3    Honor is quickly summarize our arguments and then deal with

 4    each of the arguments after I do that.

 5              THE COURT:  How long do you need?

 6              MR. LIPMAN:  I think I probably need about 20 minutes.

 7              THE COURT:  Very well.

 8              MR. LIPMAN:  I would like to reserve some time for

 9    rebuttal if that is fine.

10              THE COURT:  Yes.  You should reserve five minutes of

11    the 20.

12              MR. LIPMAN:  Your Honor, our arguments are as follows:

13              First, the bundle of rights that the known purchasers

14    who bought notes in this deal, the Squared CDL 2007-1.  That

15    bundle of rights is set out in the offering circular for the

16    deal.  In the documents that are referenced in the offering

17    circular, that is the global management agreement and the

18    indenture.  The offering circular talks about how what the

19    collateral deal was going to look like, what criteria was going

20    to meet, all of which criteria it met.  But the offering

21    circular did not talk about how the portfolio was going to be

22    selected or sourced during the time that the collateral in the

23    portfolio was being wrapped up.

24              THE COURT:  You are ignoring all of the other

25    documents issued.  You are talking only about the offering
```

1ao6ussc

1    circular, right?

2              MR. LIPMAN:  I am not ignoring them, your Honor.  Each

3    of the documents says that the offering circular is the sole

4    document that is the relevant document for purposes of

5    identifying what rights the --

6              THE COURT:  I understand.  Don't you think that

7    whoever issues the other documents is also to be held

8    responsible for their accuracy?

9              MR. LIPMAN:  Your Honor, in order for it to be fraud,

10   the fraud has to --

11             THE COURT:  Well, fraud is a general term.  You are

12   talking now about two different statutes.

13             MR. LIPMAN:  Yes.

14             THE COURT:  None of them 10B, which is the main

15   fraught statute, one of them is 17(a), which does not

16   apparently require quite the same state of mind that 10B does,

17   and the other is the Investment Advisors Act, which is in some

18   ways less specific than 10B.

19             MR. LIPMAN:  That's right, your Honor, but for all of

20   these statutes -- 10B, 10B-5, common law fraud, wire fraud,

21   mail fraud, which means to deprive the person, the victim of

22   the benefit of his bargain -- unless there is a deprivation of

23   the benefit of the bargain, there no fraud.  In fact, one of

24   the seminal cases in the Second Circuit, this Chemical Bank

25   case in which the facts were as follows:  A company was

1ao6ussc

1    borrowing money from a bank, or from several banks, and put up

2    as collateral securities and also wrote a guaranty.  The

3    argument was isn't the guaranty, the promise to perform the

4    guaranty part of the fraud such that because that guaranty was

5    false, the offering of securities Escalaro was a violation of

6    10B-5.  The Court said, No.  The guaranty was peripheral,

7    collateral to the core of the bargain that the banks got.  And

8    there was nothing wrong with the actual security that was

9    handed to the bank as collateral, therefore it was not the

10   10B-5.

11        THE COURT:  We're not dealing with 10B-5.  We're

12   dealing with 17(a).

13        MR. LIPMAN:  Your Honor, the difference is the state

14   of mind, not whether the person needs to be deprived of the

15   benefit of their bargain.

16        THE COURT:  It is not that clear because as you know

17   since there is no private action under 17(a), there has been

18   much less litigation under 17(a).  It is not as clearly

19   developed that it mirrors 10B except with respect to who can

20   bring the suit.  You are right it is state of mind surely, but

21   it is not crystal clear what the specialty of the subdivisions

22   of 17(a) require.

23        MR. LIPMAN:  Your Honor, it is not crystal clear what

24   they require with respect to intent or state of mind.

25        THE COURT:  No, it is not clear what they require

1ao6ussc

1    otherwise as well.  There are several different ones.

2            MR. LIPMAN:  Well, there are several different ones.

3    Each of them is separate.  17(a)(1) requires intent and (2) and

4    (3) are different.  They do not, according to current law,

5    require intent.  They can be satisfied with negligence.

6            THE COURT:  Correct.  But they also reach different

7    conduct, isn't that right?

8            MR. LIPMAN:  They reach different conduct, but what

9    they describe is different conduct that results in fraud.  So

10   at the end of the day you need to see whether there is a fraud,

11   how that fraud was perpetrated, whether it was through

12   negligence or through intentional conduct is a separate

13   question from whether there was a fraud.  So to know whether

14   there was a fraud, you need to see whether the person who was

15   deceived was actually deprived of the benefit of his bargain.

16           THE COURT:  But you call it the benefit of the

17   bargain.  Deprived of material information that is how the law

18   describes it.

19           MR. LIPMAN:  Your Honor, you are right.  Deprived of

20   material information but then you have to ask yourself, Well,

21   where is that information?  Where is the bundle of rights that

22   the person who is deceived, where is his bundle of rights?  The

23   bundle of rights in this case is in the offering circular, in

24   the indenture and the collateral management agreement.

25           We cite to the Court the cases of the Independent

1ao6ussc

1    Order of Forrester and Banco Esirito Santo, and those cases

2    deal with similar allegations and similar facts.  In each of

3    those cases, the First and Second Circuits and then Judge

4    Mukasey looked at the actual operative documents and looked

5    carefully at the fact that the other documents that --

6              THE COURT:  Because there is a pitch book.

7              MR. LIPMAN:  Right.  Each had a pitch book or

8    something that looked like a pitch book.  Each of those had

9    oral representations that were allegedly different from what

10   was in the offering circular.  At the end both of those cases

11   said that you have to look to the offering circular because the

12   offering circular and the pitch book, or what is like a pitch

13   book in those cases, said that the only operative document is

14   the offering circular.  The offering circular said it and the

15   pitch book said it.  That is our case, your Honor.

16             In fact, if you look at those cases what they say --

17   Judge Mukasey goes through the whole analysis where he says,

18   Well, one of the things that happend here is that the offering

19   circular told the purchasers that they are relying on their own

20   analysis and it is up to them to determine whether this is an

21   appropriate investment for them.

22             That exact representation, your Honor, is in our

23   offering circular.  Our offering circular, on page 1, Exhibit A

24   to the exhibits that we provided for the Court, it says right

25   at the beginning, "In making your investment decision, you

1ao6ussc

1    should rely only on the information contained in this offering

2    circular.  No person has been authorized to give you any

3    information or make any representation other than as contained

4    in this offering circular," which that exact language, that

5    same concept, was key to the decision in the Independent Order.

6              THE COURT:  I understand, but here what is being

7    argued is there is something omitted, which is not quite the

8    same.

9              MR. LIPMAN:  No, your Honor, because both of those

10   cases also involve omissions.  It is what it is that the

11   plaintiffs in those cases weren't told in addition to what they

12   were told.

13             THE COURT:  Right.  Here the principal reliance is on

14   what was not told on the omission.

15             MR. LIPMAN:  Your Honor, that is exactly right, which

16   is why it is so important to pay attention to what they were

17   told and whether anything else needs to be told.  Now, a person

18   has no obligation to say anything unless there is one of two

19   things:  Either there is a duty to speak or something people

20   who need to complete a sentence if the sentence unless

21   completed would be misleading.  So what we're saying is there

22   no duty to speak at least not until Mr. Steffelin becomes the

23   adviser to the CDO SPVs, which doesn't happen to May 11th after

24   the deal is already capitalized.  So he has no duty.

25             THE COURT:  He had no connection with it until that

1ao6ussc

1    time?

2              MR. LIPMAN:  No, I didn't say that.  He had a

3    connection.  He was involved in portfolio selection.

4              THE COURT:  Right.

5              MR. LIPMAN:  But he did not have any duty to speak on

6    any topic to anyone because that selection could be done at

7    random.

8              THE COURT:  But it wasn't, was it?

9              MR. LIPMAN:  No, it wasn't.  But, your Honor, what I

10   am saying is there are two buckets:  Either a duty to speak,

11   and that is either fiduciary relationship or something like

12   that; and the second bucket is completing a sentence or

13   completing a statement because otherwise it would be

14   misleading.  So he doesn't fall into the first bucket because

15   he was not anybody's fiduciary.

16             THE COURT:  It is argued by the SEC that he was a

17   fiduciary.

18             MR. LIPMAN:  Your Honor, they can argue it but they

19   cannot make it so, right?  A fiduciary relationship needs to

20   start with some interaction or contract.  Here he was hired.

21   He was specifically hired or he was GSE, his employer was,

22   specifically hired to act as a fiduciary on May 11th.  Up until

23   that time he was not anybody's fiduciary.  So they say that he

24   was a fiduciary, but frankly even in the complaint, and I ask

25   your Honor to look at the complaint --

1ao6ussc

1          THE COURT:  Of course.

2          MR. LIPMAN:  In their opposition papers they say he

3     was a fiduciary of the note purchasers.  It is not in the

4     complaint, your Honor.  It is not in the complaint for a good

5     reason.  Because first there is a D.C. Circuit opinion right on

6     point that says that investment adviser is a fiduciary of the

7     person that advises but not anybody down the line.  That is

8     number one.  The case is Goldstein.

9          The second point is, as your Honor knows from insider

10    trading cases, I know your Honor is steeped in that, there are

11    two theories on insider trading, the traditional theory and the

12    misappropriation theory.  The reason they need the

13    misappropriation theory is that someone who works for a

14    corporation does not owe duties to anyone in corporation who is

15    not a stockholder.  The traditional theory your only duty is to

16    the corporation and its shareholders but not to its noteholders

17    because they hold debt as opposed to stock.  So the

18    misappropriation theory fills that hole precisely because there

19    is no duty.  There is no duty.

20          Here CDO SPVs are corporate entities.  Mr. Steffelin,

21    or GSC, were hired by these corporate entities to advise them

22    and so the duty would run to the shareholders and to those

23    corporations, but not to the noteholders, which is why they

24    didn't allege in the complaint that there was any duty running

25    to the noteholders.  What they alleged was that there was a

1ao6ussc

1  duty running to the SPVs.  Let me address that for a second and

2  then I will go back to where we started.

3       We said in our brief, and they did not dispute this as

4  true, to the extent that the SPVs were prospective clients,

5  there are really two reasons to make disclosures to prospective

6  clients because because they prospective clients the investment

7  adviser doesn't yet have a fiduciary obligations to them.  The

8  two things that the investment adviser has to advise on are

9  things that relate to conflicts because that is the decision

10  that the prospective client has to make.  The prospective

11  clients has to make one of two decisions, either if the

12  investment adviser is advising with respect to a particular

13  transaction in which the investment adviser has an interest

14  then obviously the potential client needs to know that in order

15  to either agree to participate in it or not.

16       The second is when if an investment adviser has a

17  structural conflict where his loyalties might be divided and so

18  the potential client needs to know that before deciding whether

19  to engage in that investment advise.  That decision is made at

20  the time that the investment adviser actually hires the --

21  sorry, the client actually hires the investment adviser.  Any

22  conflict that exists in the past is just not relevant because

23  the question is:  At the time that you are being hired, are you

24  conflicted?  Here the conflict that they were talking about in

25  their complaint was, and I am happy to discuss why it wasn't a

1ao6ussc

 1   conflict, but that let's assume it was a conflict for purposes

 2   of argument, that conflict was extinguished in February.  The

 3   CDO SPVs were not created until April and they weren't

 4   capitalized until May 11th.  So by the time they were in a

 5   position to make a decision about whether to hire him, let

 6   alone by the time they had any interest that were relevant to

 7   whether they should hire him, his conflict was long

 8   extinguished and therefore he had no obligation to disclose

 9   anything to them.

10        Now, let me get back to the original point that your

11   Honor raised and you said, Well, aren't there other documents.

12   Even if other documents are relevant here, let's assume the

13   pitch book is relevant, the pitch book itself, and I would like

14   to point this out to the Court, the pitch book itself is very

15   clear that the pitch book deals with one topic.  It is Exhibit

16   B in our exhibits.  The pitch book deals with one topic only

17   and that topic is how the portfolio would be selected, not how

18   the portfolio would be sourced and from whom.  With respect to

19   the first topic, what it talks about is analysis.  Let me just

20   direct the Court's attention to page 5 of Exhibit B.

21        THE COURT:  Yes.

22        MR. LIPMAN:  Do you have it, your Honor?

23        THE COURT:  I do.

24        MR. LIPMAN:  So this is the page that the SEC

25   complains about.  This is the page that says the portfolio will

1ao6ussc

1    be selected and managed by GSC Group.  They take that to mean

2    that the portfolio will be selected and also sourced by GSC

3    Group and because Magnetar was involved in the back and forth

4    on what they were going to short they say, Well, this selected

5    is misleading.  It needed to say something else.  Now, looking

6    down on the last bullet point on the very same page, your

7    Honor, it says, GSC uses its low-level model to select and

8    monitor RMBS investments by ranking more than 14,500 pieces

9    using proprietary coverage ratios.

10          There is no doubt what this is talking about is

11   applying a mathematical model to assets to determine, to select

12   them by doing mathematical analysis.  There is no doubt that

13   that is all it means.  It doesn't mean anything else.  It

14   can't.  Your Honor, by the way, and we'll get into this in a

15   couple minutes, but this page was actually not prepared by GSC

16   or Mr. Steffelin.  Every page in this book that is prepared by

17   GSC or Mr. Steffelin is identified as source GSC and the date.

18          THE COURT:  It says GSC.

19          MR. LIPMAN:  I am sorry.  GSC is Mr. Steffelin's

20   former employer.

21          THE COURT:  This page says GSC.

22          MR. LIPMAN:  Yes, your Honor.

23          THE COURT:  There is something smaller underneath it.

24          MR. LIPMAN:  Your Honor, let me direct your attention

25   to page 18 because we're going to look at that page.

1ao6ussc

```
 1          THE COURT:  I was looking at the page you are
 2   referring to.
 3          MR. LIPMAN:  I understand.  I will point your Honor to
 4   the difference between those pages.
 5          THE COURT:  Yes.
 6          MR. LIPMAN:  Page 18, it says on the left side, right
 7   above J P Morgan, Source GSC, March 16, 2007.  According to the
 8   complaint, this is the complaint now, the pages in this book
 9   that were prepared by GSC had this legend on them.  So to the
10   extent there are pages in this book that were prepared by GSC,
11   they are stamped that way and they say source GSC and the date.
12   So this first page was not prepared by GSC.  It was prepared by
13   J P Morgan.  And it makes it very clear when they talk about
14   the selection, they are talking about the analysis.
15          Let me draw the Court's attention to the only relevant
16   time in which this pitch book uses the word "select."  That is
17   on page 43, your Honor.
18          THE COURT:  Just a moment.  Yes.
19          MR. LIPMAN:  On page 43 at the top it says, Investing
20   in the portfolio involves particular risks.  The primary credit
21   risk of notes issued under this transaction is that of the
22   underlying asset portfolio.  Changes in the composition of the
23   portfolio may be affected in response to any changes in market
24   conditions applicable --
25          THE COURT:  She is not a machine.
```

1ao6ussc

1          MR. LIPMAN:  I am sorry, your Honor.

2          -- to such reference obligations in the discretion of

3     the portfolio manager.  However, circumstances and events

4     affecting the portfolio after the initial composition such

5     portfolio may result in such portfolio ceasing to meet the

6     original criteria and restrictions for their selection.

7          We discussed this all in our brief.  This is the only

8     other relevant time that the word "selection" is used, and this

9     is clear that they are talking about analysis as opposed to

10    sourcing.  By the way, we say it in our brief and I will

11    continue saying it, there is not anything in this complaint

12    that alleges that the analysis was not done exactly as it is

13    described here.  In other words, what it says here GSC has

14    done, that is what GSC did according to complaint because they

15    would have alleged otherwise.

16         In effect, your Honor, the cases they filed last week

17    against Citi and an individual, in that case the SEC alleges

18    the collateral manager Credit Suisse did not do the analysis

19    that --

20         THE COURT:  That was represented.

21         MR. LIPMAN:  -- that was represented.  Here, on the

22    other hand, they did the analysis exactly as they described it.

23         If I may ask the Court to turn to page 18.

24         THE COURT:  Yes.

25         MR. LIPMAN:  Page 18 is the relevant page that

1ao6ussc

1    summarizes the analysis that GSC said it would do and this one

2    says source GSC March 13, 2007.

3                THE COURT:  Yes.

4                MR. LIPMAN:  This talks about modeling, analyzing the

5    structure of the deal making sure that everyone on the

6    investment committee -- there was an investment committee.

7    Mr. Steffelin was in no position to make any decison on his

8    own.  Everyone on the investment committee had to agree.  Then

9    it says best execution.  On the best execution piece, they talk

10   about price discovery, check spreads, liquidity analysis,

11   technical flows, dealer access, which means dealers who are

12   putting things out to bid and buy and sell decision.  What this

13   doesn't talk about is how or from whom the portfolio would be

14   sourced.

15               Now, your Honor, in this case they just filed last

16   week, the Credit Suisse case, we supplied to your Honor the

17   order of the SEC in that case, and we did it because the issue

18   as we said in our brief what they are doing is they conflating

19   selection with sourcing.  So we called the Court's attention to

20   the Commission's own findings of fact, finding of fact now,

21   about what it means to source.  They go through it in

22   Paragraphs 34, 35 and 36.  What they are saying is there are

23   two ways that people can source collateral for these deals.

24   One way is to go to the market and ask forbids.  The second is

25   to go directly to a counterparty who is willing and deal with

SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300

1ao6ussc

1    that counterparty.  There is nothing wrong with either one of

2    those.  In this case at least they don't appear to be alleging

3    that there was.  In other words, this is standard procedure.

4    You either go to the market or if it makes sense, your Honor,

5    you have to source a billion dollars worth of assets.  You can

6    do it in the market or if you have a billing counterparty why

7    won't you go to the counterparty.

8           Without an allegation that they got a different price

9    or they colluded or something like that, of which there is none

10   here, there is no allegation that assets procured a source from

11   Magnetar or sourced anything other than a market price.  There

12   is no allegation that there was any collusion.  This is a

13   negligence case, right?  So what they are saying in effect is

14   that the pitch book said select, but it needed to say that it

15   also was sourced for Magnetar.  That, your Honor, not only is

16   there no obligation to say anything, but when you are talking

17   about selection and you are talking about analysis,

18   mathematical formula, you are not talking about where and how

19   you are going to source, especially when the where and how you

20   are going to source is really not relevant because there is

21   nothing improper with going to a particular counterparty to

22   source as much collateral as you would like.

23          But, your Honor, even if you weren't persuaded, let's

24   say that you decided that the bundle of rights you are not

25   persuaded, now you are not persuaded that the pitch book said

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1ao6ussc

```
1    what I said it said, your Honor, these are not statements of

2    GSC or Mr. Steffelin.  The pitch book was put together by J P

3    Morgan for a purpose.  The purpose was that they were going to

4    go to a Paris conference and gauge interest, market interest in

5    the deal such as this.  Now, they started to be sure ramping

6    this deal but then they stopped because the market turned

7    against them and they wanted to decide -- this is all in the

8    complaint by the way -- decide whether it made sense.  So they

9    went to the conference and the conference was for the purpose

10   of trying to see whether there was any interest.  So they asked

11   Mr. Steffelin -- this is also in our exhibit list.  It is

12   Exhibit F and this is an e-mail that is referenced in the

13   complaint, your Honor, so it is properly before you.  It is

14   actually quoted in the complaint.  This is the e-mail, Exhibit

15   F, an e-mail exchange in which someone from J P Morgan -- your

16   Honor, I apologize, we redacted the names to protect the

17   innocent, but of course if the Court would like we can provide

18   the Court with unredacted versions of the documents.

19             THE COURT:  All right.

20             MR. LIPMAN:  What this is is if you look on the bottom

21   of the next to last page it is from someone at J P Morgan on

22   March 16 and it says, Hi Ed.

23             You have it, your Honor, right?

24             THE COURT:  Yes.  Thank you.

25             MR. LIPMAN:  So this is an e-mail to Mr. Steffelin.
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ao6ussc

It says, Hi Ed.  It is to Mr. Steffelin and his associate.  Hi,

Ed, we would like to finalize the market to generate momentum

ahead of the Paris conference.  On our side we are finalizing

the structure and general transaction sections.  We're talking

about the pitch book now.

THE COURT:  Yes.

MR. LIPMAN:  We need your focus on the following

pieces:  Update GSC's organizational sections, update GSC's

transactional history, consider adding slides that reflect your

CDO investment monitoring process.  The current material is

RMBS focus and has very little on CDO investments.  Add an

appendix with stats on current portfolio.  On CDO Squared we

have been marketing it has been a constant request from

investors.  Common request involve drill down and analysis

regarding sector, vintage, manager and overlap.

What this is asking is for two things:  One,

information that is uniquely within the purview of GSC.  That

is, who works there, what other deals they've done and how they

analyze their assets.  With respect to the how, what they are

asking about is they are saying, Look, you've given us generic

information about how you analyze RMBS, now give us generic

information about how you analyze CDOs and when you do that

focus on these issues -- sector, vintage manager and overlap.

Your Honor, sector, vintage, manager and overlap are all in the

offering circular and there is a disclosure in the offering

1ao6ussc

1    circular about what this portfolio is going to look like with

2    respect to sector, vintage, manager and overlap.

3            So what they are asking here is they are not saying

4    give us the pitch book.  When we were here before you last

5    time, Ms. Folena stood up and she said he offered the pitch

6    book and the pitch book he knew was false and misleading.  The

7    problem is that he didn't offer the pitch book.  J P Morgan

8    asked him for information that was particularly within his

9    purview -- who works with you, what other dealings you have

10   done and tell us how you analyzed the portfolio, particularly

11   focusing on these issues that people are interested in.  J P

12   Morgan knew as well as Mr. Steffelin did what role, alleged

13   role, Magnetar paid in the portfolio selection.  They didn't

14   need Mr. Steffelin to tell them.  So what they did was they

15   asked him for information that he would have, put it in the

16   pitch book and then used it in the Paris conference.

17           Now, after that I asked the Court last time we were

18   here and asked the Court to do it again, go to the complaint

19   and see what it says about who you used the pitch book and

20   when.  J P Morgan used it, decided with, with whom, how and

21   under what circumstances.  Now, your Honor, let's talk about

22   this for a second.  I said 17(a)(2) has different standards.

23   That is absolutely right.  This is negligence, right?  In other

24   words, this is a situation in which what Mr. Steffelin is

25   alleged to have done is made a mistake or not foreseen that

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ao6ussc

1    somebody else might make a mistake.  The reason 17(a)(2) cases

2    that we cite to your Honor makes sense in that they say that

3    the person liable has to be the person who is actually speaking

4    or using the statement is that that is the person who controls

5    the who, the when, the how, right?  So Mr. Steffelin on his

6    part had to have -- in order to be liable, he had to have

7    foreseen that J P Morgan was going to make a mistake when it

8    used the pitch book however it decided to use it.  He didn't

9    use it.  It is not in the complaint.  I ask the Court when the

10   SEC stands up to speak, please ask them where in the complaint

11   it says how and where and with whom he used the pitch book.

12   There is one allegation that says that Mr. Steffelin spoke with

13   investors, but it doesn't say when, it doesn't say how, it

14   doesn't say who, it doesn't say anything and it does not

15   mention the pitch book.

16          So it is not his statement.  By the way, they are

17   going to stand up and they are going to say we're misusing

18   Janus.  No.  No.  The relevant cases are the opinion from Judge

19   Cote and the opinion from Judge Marrero.  Judge Cote does a

20   very nice review of the relevant case law and she does not come

21   out where Janus comes out.  She does not say that your lips

22   need to be moving in order to be liable under 17(a)(2).  What

23   she says is that you need to have control over the statement

24   and if you don't have control, you don't have primary

25   liability.  In that case, the KPMG case, she draws a

1ao6ussc

1    distinction between the KPMG partners who were actually

2    responsible for giving the opinion to Xerox that its books were

3    fine and the reviewing partner who didn't have that

4    responsibility.  So what she says is even though none of them

5    signed it personally, the signature was KPMG.  So what she says

6    is, Look, these people were responsible for the opinion and

7    therefore they can be liable as primary violators, but this guy

8    he was a reviewing partner.  If he knew that the opinion was

9    false then he may be liable as an aider and abettor but he does

10   to the have primary liability.

11          Judge Marrero comes to the same conclusion under

12   similar circumstances, although not involving opinions.  It is

13   a case involving market timing if I remember correctly and

14   there is a difference between the person who actually is in

15   charge of doing the relevant portfolio investment and the

16   person who doesn't.  They are both involved in a deliberate

17   scheme.  The decision is about the scheme.  So what Judge

18   Marrero says, he says, Look, they might be liable, both of them

19   under primary liability under 17(a)(3) because they are part of

20   the scheme, but only the person who is charged with and who has

21   control over the statements is the person who can be primarily

22   liable under 17(a)(2).  That is why even if you disagree with

23   us on that the offering circular is all there is, even if you

24   disagree with us that the pitch book is true in all materials

25   or respects, which it is, Mr. Steffelin is not the person who

1ao6ussc

1    is liable as a primary violator and to hold him liable would in

2    effect impose an obligation on him to foresee that when J P

3    Morgan uses the pitch book, it is going to use it in a way that

4    is going make a mistake.  It is really a bridge too far.

5            Let me address now 17(a)(3), because it is a separate

6    allegation.  As we said in our briefs, 17(a)(2) deals with a

7    particular type of conduct.  The conduct it deals with is

8    making statements or making omissions in light of the

9    statements made.  17(a)(3) is a scheme case.  It is a scheme

10   liability.  The SEC relies on Naftalin, which is a criminal

11   17(a)(1) case involving short selling.  So that case Naftalin,

12   first off it is not about disclosures.  It is about the scheme

13   to defraud that falls fairly within 17(a)(1).  What that case

14   squarely stands for, and that is what it says, is that

15   17(a)(1), 17(a)(2) and 17(a)(3) all deal with different conduct

16   and different conduct must be alleged.  What it says is you

17   can't use 17(a)(2) or (3) to limit the scope of 17(a)(1).  But

18   what it doesn't say is that you can drive a 17(a)(3) truck into

19   a 17(a)(2) gate.  That you cannot do.  In this complaint the

20   only allegation is that the pitch book, just the pitch book now

21   because he is not charged with anything else, the pitch book

22   omitted to disclose that the portfolio was being sourced during

23   the period for Magnetar.  That is an omission case, not a

24   17(a)(3) case.

25           Let's move really quickly to 2062.  2062 is just like

1ao6ussc

```
 1   17(a)(3) and it covers the same conduct.  It applies in two
 2   situations.  It applies to people who already are fiduciaries
 3   and it applies to people who are not.  When it applies to
 4   people who are not, it is the same conduct as 17(a)(3).  So if
 5   you don't are a violation of 17(a)(3), you don't have a
 6   violation of 2062 on the same facts.  When somebody is a
 7   fiduciary, which is the case that the SEC cites, that is where
 8   the obligation to speak arises.  Right?  Because that is the
 9   difference between the cases dealing with someone who is and
10   who isn't a fiduciary.
11           Now, one last thing, your Honor, at the end of the day
12   even if they are right about everything, what they are going to
13   ask you to do is to enjoin Mr. Steffelin from making mistakes
14   in the future.
15           THE COURT:  That's down the road.  We are now in a
16   motion to dismiss the complaint.
17           MR. LIPMAN:  I get that, your Honor.  What we're here
18   for, just so that there is no mistake, because the offering
19   circular he is not charged with anything charged with in the
20   offering circular.  The pitch book, we just went through.
21   There is mention of a term sheet.  He is not charged with
22   anything regarding that.  There are no allegations of his
23   sending the pitch book, using the pitch book, employing the
24   pitch book in any way.  Then at the end of the day even if all
25   of that falls away, the relief they are seeking is an
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ao6ussc

 1    injunction against future negligent violations they are going

 2    to ask you to enjoin him from being negligent in the future.

 3    That is strange.

 4            THE COURT:  Don't we always tell people to be very

 5    careful?

 6            MR. LIPMAN:  Your Honor, my only answer to that is

 7    people already know.  By the way, if going through this process

 8    wasn't enough to put Mr. Steffelin on notice to be careful, I

 9    don't know what would.

10            The point, though, is that this is a unique case.

11    This is the first case that the SEC ever brought in which all

12    they charged was negligence and nothing else.  It is a first

13    contested procedure.  There is one now again that they charged

14    last week.  This is the first of its kind, which is why all the

15    cases your Honor would look like, all of those cases, are cases

16    involving 17(a)(1) and something else.  There is one case that

17    they cite, Tambone, and frankly Tambone is on all fours with

18    Judge Cote's opinion in KPMG.  It actually works well together.

19    It stands for the same preposition, which is that you actually

20    need to use the statement in order to be liable.  If you look

21    at Tambone, what that case is about is says that the person

22    there charged under 17(a)(2) with acting intentional, not

23    negligently.  In this complaint it says that he should have

24    known.  Should have known.

25            THE COURT:  This is not an allegation of intentional

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ao6ussc

1    misconduct.

2          MR. LIPMAN:  Right.  But what they are asking your

3    Honor to do or what would ask your Honor to do is enjoin a

4    human being from making a mistake in the future.

5          THE COURT:  Sufficient unto the day.  Relief is down

6    the road.

7          MR. LIPMAN:  I understand, your Honor.  Your Honor, if

8    there are any questions, I am happy to respond obviously.

9          THE COURT:  The central complaint here really is the

10   failure to disclose that Magnetar, which was the short party on

11   many, many of these transactions, chose the investments.

12         MR. LIPMAN:  Your Honor, let me address that.

13         THE COURT:  Yes.

14         MR. LIPMAN:  I was actually going to wait but let me

15   do it now.

16         This is a synthetic deal.  This are 65 assets.  61 of

17   them are synthetic, meaning for each of those assets there is a

18   short counterparty.

19         THE COURT:  The derivatives are wild arrangements.

20         MR. LIPMAN:  They are but this is not a secret.  This

21   is how this deal is done.  It is marketed as a synthetic deal.

22   In fact, your Honor, I recommend to the Court the SEC's order

23   in Credit Suisse because it goes through how these deals are

24   put together and what is relevant about the various things.

25   One of the things it talks about is that the noteholders, note

1ao6ussc

```
1    purchasers, get paid from the proceeds of the insurance policy
2    payments in effect that the credit both parties pay when they
3    short the assets.  That is where the coupon payments come from.
4    So it is not the secret from anyone that there is going to be a
5    short counterparty for every one of the synthetic assets in the
6    pool.  What is crucial, though, is that each one of those CDS
7    is independent of each other CDS in the portfolio.  So you can
8    short one or two or four but how your CDS do is independent of
9    each other.  How your CDS do is also independent of how the
10   portfolio does as a whole.
11            THE COURT:  When you are talking about "independent,"
12   what the essential charge here is that most of these assets
13   were chosen by the short party.
14            MR. LIPMAN:  Let me address that.  They were chosen in
15   a sense that --
16            THE COURT:  In the sense that Magnetar said this is
17   what we want.
18            MR. LIPMAN:  But, your Honor, that is not what
19   happened.
20            THE COURT:  Well, maybe it is not.
21            MR. LIPMAN:  No, no, your Honor.
22            THE COURT:  I am not trying the case now.
23            MR. LIPMAN:  It is contradicted even by the complaint.
24   They cannot make that allegation.
25            THE COURT:  Why is that?
```

1ao6ussc

1          MR. LIPMAN:  I would ask your Honor to look at

2     Paragraph 61 of the complaint.  This is a summary.  They break

3     the selection process into three pieces.  They say that there

4     is Phase I, Phase II and Phase III.  Those are completely

5     artificial breaks because there is nothing really to separate

6     Phase I, Phase II and Phase III that makes --

7          THE COURT:  Right.  But what is important really is

8     the number of Magnetar names that appeared.

9          MR. LIPMAN:  Your Honor, that is true but that does

10    not change the fact that each of those assets was analyzed and

11    was reviewed and approved exactly as the pitch book said they

12    would be and it also does not change the fact that there were

13    assets.  By the way, I need to correct something.  In our brief

14    I said that 17 percent of the assets in Phase III were sourced

15    from somebody other than Magnetar.  It is 10 percent.  It is 17

16    percent during the entire time that Magnetar was involved.  So

17    17 percent of assets were obtained from somebody other than

18    Magnetar.

19          Now, your Honor, I want to spend a little time on this

20    because this is very important.  What this complaint does is

21    makes it sound as if -- and we challenged them in our briefs.

22    We said, Look, in the complaint it sounds as if what you are

23    saying is the set of assets that they chose is different from

24    the set of assets that they short.  And, look, there are only

25    65 assets.  The investigation was two and a half years or two

1ao6ussc

1    years plus.  We went through six months of a wells process.  We

2    know where each of the assets came from.  It is just not a

3    secret.  In our brief we said, Is there one that you can

4    identify?  In their opposition papers they come back and they

5    said, and this is page 5 of their opposition brief, Anything

6    that Magnetar didn't choose to short didn't make it into the

7    portfolio.  They relied in the complaint an e-mail that is

8    dated February 20th.

9              MS. FOLENA:  What is the exhibit number?

10             MR. LIPMAN:  May I approach, your Honor?

11             THE COURT:  Yes.

12             MR. LIPMAN:  So, your Honor, in what they call Phase

13   II in the complaint, and it's on page 12 of the complaint.

14             THE COURT:  Which is the e-mail that you are drawing

15   my attention to?

16             MR. LIPMAN:  This entire chain of e-mails, and let me

17   just explain what this is.  This is one of the e-mails.  We

18   asked the SEC to give us copies of all the documents that were

19   referenced in the complaint.  This the e-mail that they

20   produced to us as one of the e-mails referenced in the

21   complaint.

22             If I can direct your Honor's attention to paragraph 44

23   of the complaint on page 12.

24             THE COURT:  You are going way over time.

25             MR. LIPMAN:  Your Honor, this is a very important

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

1ao6ussc

```
 1    issue.  The reason it is important is that they are entitled to
 2    have your Honor accept as true the allegations in the
 3    complaint.
 4              THE COURT:  That's right.
 5              MR. LIPMAN:  They are not entitled to have you accept
 6    as true allegations that they know to be false.
 7              THE COURT:  Well, then you should move for summary
 8    judgment.
 9              MR. LIPMAN:  Your Honor, this e-mail is fairly within
10    the motion to dismiss Ambeth because it is referenced in the
11    complaint.
12              THE COURT:  I see.  And which one of these is it?
13              MR. LIPMAN:  There is a schedule attached in the
14    e-mail and it is paragraph 44.  Actually, it is paragraph 45.
15    I apologize.
16              THE COURT:  You've handed me a series of e-mails.
17              MR. LIPMAN:  Yes.
18              THE COURT:  Which e-mail is it that you want me to
19    look at?
20              MR. LIPMAN:  Your Honor, it is on the second page.
21    There is an e-mail that says from Ms. Chang to others and
22    says --
23              THE COURT:  It says to James Presco.
24              MR. LIPMAN:  Right.  It says, We're looking to trade
25    the attached Double A list for CDO Squared.  Below the double
```

1ao6ussc

 1  line are still subject to internal credit approval.  Let me

 2  know if you need anything else.

 3           Do you see that, your Honor?

 4           THE COURT:  Yes.

 5           MR. LIPMAN:  If I may ask the Court to flip the page.

 6           MS. FOLENA:  Which way?

 7           MR. LIPMAN:  Forward so your Honor can see the

 8  schedule.

 9           THE COURT:  Yes.

10           MR. LIPMAN:  According to the allegations in the

11  complaint, the complaint says there are 12 assets that were

12  shown to Magnetar, that Magnetar accepted or shorted 10 of

13  those assets and that the two that they didn't short, didn't

14  make it into the portfolio.

15           THE COURT:  Yes.

16           MR. LIPMAN:  Below the line, what Ms. Chang said in

17  the e-mail was, We've analyzed ones above the line and we're

18  okay with any of these going into the portfolio, but ones below

19  the line we're still analyzing.

20           THE COURT:  Yes.

21           MR. LIPMAN:  Below the line, there are two assets

22  below the line that were in the final portfolio.  I am sorry,

23  there are three assets below the line that were in the final

24  portfolio.  Two of those assets were put on the market to see

25  whether there would be bids from someone other than Magnetar

1ao6ussc

1   and only one of those ended up in a portfolio because only

2   one --

3           THE COURT:  The problem is we're getting far beyond

4   the complaint.  This is a motion to dismiss on the face of the

5   complaint.

6           MR. LIPMAN:  Your Honor, we spent a bunch of time in

7   our brief showing to the Court that their allegations about

8   what the offering circular said, their allegations in the

9   complaint what the offering circular said are not true, that

10  the offering circular doesn't say what they allege it says.

11          THE COURT:  That is something else.  This is not the

12  offering circular.

13          MR. LIPMAN:  The offering circular is not the only

14  example.

15          THE COURT:  I can read the complaint.  That is the

16  principal document on a motion to dismiss on the face of the

17  complaint.

18          MR. LIPMAN:  If all you were going to rely on is just

19  the complaint itself, let me just leave you with this thought:

20  10 percent of the portfolio that was sourced in Phase III was

21  sourced from somebody from Magnetar and there and is no

22  allegation in the complaint that Magnetar had anything to do

23  with selecting or sourcing those assets.

24          THE COURT:  I understand but you've gone far over time

25  now.  I will carefully consider what you told me, but I have to

1ao6ussc

1      give the other side a chance to be heard before lunch.

2                 MR. LIPMAN:  Thank you, your Honor.

3                 MS. FOLENA:  Good afternoon, your Honor.  Jan Folena

4      and Robert Dodge for the United States Securities and Exchange

5      Commission.  The Commission respectfully requests that the

6      Court deny Mr. Steffelin's motion to dismiss as our complaint

7      sufficiently states a claim for 17(a)(2) and (3).

8                 THE COURT:  Let's look at (a)(3).

9                 MS. FOLENA:  Okay, (a)(3).  We sufficiently state a

10     claim under (a)(3).

11                THE COURT:  What is the claim under (a)(3)?

12                MS. FOLENA:  The claim under (a)(3) is that the

13     process of allowing a party directly at odds with those

14     noteholders to select assets in the portfolio operated as a

15     fraud and a deceit on the noteholders of the CDO.  The reason

16     that is is that GSC and Mr. Steffelin were investment advisers.

17     Investors know that investment advisers have a fiduciary duty

18     and obligation.

19                THE COURT:  Where was Steffelin listed as AN

20     investment adviser.

21                MS. FOLENA:  In the pitch book.

22                THE COURT:  That is how he was described, as an

23     investment adviser to the transaction?

24                MS. FOLENA:  Yes.  GSC Group overview:  Registered

25     investment adviser on page 8 of the pitch book, which is

1ao6ussc

1    Exhibit B.

2              THE COURT:  Registered to whom?  To advise whom?

3              MS. FOLENA:  In this case he is an investment adviser

4    to the special purpose vehicles, but it relevant to the --

5              THE COURT:  Aren't the entities that he is advising

6    the ones to whom he has some obligation?

7              MS. FOLENA:  That is where his fiduciary duty runs,

8    your Honor, correct.

9              THE COURT:  But that is not where you are trying to

10   place it.  You are trying to place it on the investors.

11             MS. FOLENA:  I agree.  But all I am saying is that his

12   role as an investment adviser is relevant.

13             THE COURT:  That doesn't float in the air.  Investment

14   advisers are not a generalized category.  People are

15   fiduciaries of specific beneficiaries of their fiduciary

16   obligation.  They are explicitly to prospect those they engage

17   to protect.  Now, of course everybody should protect everybody

18   here, but that is a separate point.  You are asserting in

19   behalf of the SEC and in behalf of the investors that if this

20   man was a fiduciary of others, if he breached his fiduciary

21   duty to the investors, it is a different fiduciary duty.

22             MS. FOLENA:  No.  That is not the argument I am

23   making.  I am simply saying because of his role as an

24   investment adviser people would not expect that he would

25   allow --

1ao6ussc

```
 1            THE COURT:  That is a big strain.

 2            MS. FOLENA:  Put that aside.

 3            THE COURT:  A fiduciary duty runs to those who are

 4    protected by it and those are the people who are entitled to

 5    rely on his having an "I sold to their interest."  We don't

 6    call it fiduciary if he doesn't have an "I sold to the interest

 7    of the investors."  That is an entirely different relationship.

 8            MS. FOLENA:  I agree, your Honor, that the

 9    relationship is entirely different.

10            THE COURT:  That doesn't help you calling him an

11    investment adviser.  It doesn't invoke (a)(3).  (A)(2) is much

12    easier for you to argue here than (a)(3).

13            MS. FOLENA:  I agree entirely but here is the

14    situation:  Whenever you have a situation where you have fraud

15    or deceit, you are inevitably going to have with it a false

16    statement.  Those that are deceiving and concealing information

17    are not going to be in the business of also disclosing it.

18            THE COURT:  Just a moment.  You cannot have a

19    negligent breach of fiduciary.  There is no such thing.  It is

20    because of the high level of duty of a true fiduciary that you

21    cannot have it.  So you escape me if you think that (a)(3)

22    applies to Steffelin here.  I can see your position on (a)(2),

23    but (a)(3) is an entirely different obligation.  Otherwise they

24    wouldn't be separate provisions.  It has been held repeatedly

25    that they are different and separate provisions.  You are
```

1ao6ussc

1    trying really to ally them.

2            MS. FOLENA:  Well, I am saying that the act

3    transaction or practice that operated as at fraud was allowing

4    Magnetar to select the assets.

5            THE COURT:  I thought it is the omission to disclose

6    that fact that you are relying on primarily in this case.

7            MS. FOLENA:  That is for (a)(2), correct.

8            THE COURT:  That is (a)(2).

9            MS. FOLENA:  But it the Commission's position that the

10   practice of allowing that short to select those assets operated

11   as a fraud because investors don't walk into an investment with

12   the understanding that the party opposing that take the bet.

13           THE COURT:  That is why I am saying it was a material

14   omission.  It doesn't make it a separate matter.

15           MS. FOLENA:  Your Honor, I respectfully disagree on

16   that point.

17           THE COURT:  I understand you disagree that is why you

18   alleged it.  I think it is a big stretch.  That is, you have

19   already alleged that it was a material omission, whether it was

20   intentional or not --

21           MS. FOLENA:  Correct.

22           THE COURT:  To fail to disclose the role of Magnetar

23   in this transaction --

24           MS. FOLENA:  That's correct.

25           THE COURT:  I understand that.  I understand that for

1ao6ussc

1    purposes of passing on a motion to dismiss for failure to state

2    a claim that you may allege enough to state a claim under

3    (a)(2), but I think (a)(3) if it is the same conduct just

4    described differently is a strain.  It is a strain that you

5    cannot support because it may not be a good practice, but it is

6    a material omission and you've already gotten (a)(2) for that.

7    You have to have something else for (a)(3) and you really don't

8    so you call the material omission a breach of fiduciary, but

9    his duty was not a duty to the investors.  That is not who he

10   was a fiduciary of.

11             MS. FOLENA:  I agree.  I agree that that was not where

12   the fiduciary duty ran.  However, his sole role in this process

13   was to select the assets for the portfolio and to allow the

14   short to select those assets operated as a fraud.

15             THE COURT:  You are not stating anything other than

16   what you state when you allege a violation of (a)(2).

17             MS. FOLENA:  The underlying facts are not.  All I am

18   saying is that process separate and apart from what was

19   disclosed in and of itself operated as a fraud.

20             THE COURT:  That is a big strain.  It is not clear

21   exactly what (a)(3) would mean in this context.

22             MS. FOLENA:  I agree.

23             THE COURT:  Because it is not a high standard, you do

24   state a claim under both 17(a)(2), but I have great difficulty

25   finding the claim under (a)(3).  Every time you state it, it is

1ao6ussc

1    too much of a strain on the language of the statute.

2         MS. FOLENA:  Well, it is whether or not the same fact

3    pattern can do two things:  One, can be a false statement; and

4    two, can operate as a fraud.

5         THE COURT:  It depends on what the conduct is.  This

6    conduct doesn't bear more than one violation of 17(a), the

7    subdivisions of 17(a).

8         I deny the motion with respect to your allegation of

9    17(a)(2), but I grant the motion to dismiss (a)(3) because I

10   think (a)(2) and (a)(3) are supposed to have different

11   contents.  That is why they are separate subdivisions.

12        MS. FOLENA:  Okay.

13        THE COURT:  It has been repeatedly held that all of

14   the subdivisions of (a) are different requirements, that is not

15   a statute that repeats the same conduct in different words over

16   and over.

17        MS. FOLENA:  Your Honor, I understand the Court's

18   ruling.  The Commission urges the court to look at Naftalin,

19   the Supreme Court case that discusses that no one section of

20   17(a) limits the conduct of another.

21        THE COURT:  Of course it doesn't but you can't take

22   the same conduct and just describe it differently.  It has to

23   have some substantive difference.  The real problem you have is

24   that he is not a fiduciary.  In order to make a different

25   arrangement under (a)(3), you describe Steffelin as a fiduciary

1ao6ussc

```
 1    and he is not a fiduciary of the investors.  He does have an
 2    obligation.  Of course he has an obligation.  That is why you
 3    state a claim under (a)(2).  That is an obligation beyond
 4    fiduciary duty.  He is not a fiduciary.  That is, you have not
 5    alleged facts that make him a fiduciary of the investors.
 6              MS. FOLENA:  Correct.
 7              THE COURT:  That is what you rely on (a)(3) and it
 8    just doesn't stand up.
 9              MS. FOLENA:  Yes.  I do rely on that, but I also rely
10    separate and apart from when he has that duty to the investors,
11    which he doesn't, I rely separately in the role in the process
12    and what he allowed Magnetar to do.
13              THE COURT:  Let's not overinflate his role.  There is
14    no question that you state a claim of a material omission under
15    (a)(2), but let's not carry it too far in terms of what his
16    duties were.  It is a very close question.  It is even closer
17    than (a)(2), which I am going to sustain -- I mean I am going
18    to deny.
19              MS. FOLENA:  Okay.
20              THE COURT:  I will permit you to proceed with (a)(2).
21              MS. FOLENA:  Will you deny the motion on 2062 with
22    regards to the false statement as it is clear, the case law is
23    clear that 2062 encompasses false statements made by investment
24    advisers to the --
25              THE COURT:  That is a very close question.
```

1ao6ussc

1          MS. FOLENA:  -- to those that they advised.

2          THE COURT:  To those that they advised.  That's right.

3          MS. FOLENA:  Those are the SPVs.  We have sufficiently

4    alleged in this case that Mr. Steffelin did not advise the two

5    SPVs that were issuing the notes of two thing:  One, that

6    Magnetar selected the assets; and two, that Mr. Steffelin had a

7    conflict of interest and divided --

8          THE COURT:  Let's take the second one first.  Let's

9    look at the conflict of interest.  Is it not the fact that he

10   was no longer interested in getting a job with Magnetar when

11   this pitch book was prepared?

12         MS. FOLENA:  No.  Well, yes and no.  At the time the

13   pitch book was prepared on March 13th, the employment

14   discussions between Mr. Steffelin and Magnetar had seized; but

15   at that point as of March 13th, a significant portion of that

16   portfolio was selected with input for Magnetar.  So the

17   conflict existed at the time.

18         THE COURT:  He was actually doing it while he was

19   seeking employment?

20         MS. FOLENA:  Yes.  While the communications between

21   GSC and Mr. Steffelin and Mr. Presco at Magnetar were

22   occurring, Mr. Steffelin is attempting to get a job at

23   Magnetar.  Now, that is a divided loyalty.

24         THE COURT:  Do you deny that?  That is a divided

25   loyalty.

1ao6ussc

| 1 | MR. LIPMAN:  Your Honor, the allegations are that |

1          MR. LIPMAN:  Your Honor, the allegations are that

2     Mr. Steffelin --

3          THE COURT:  Please.  Please.  Answer my question.

4          MR. LIPMAN:  Yes.

5          THE COURT:  Do you agree that at the time that many of

6     the choices were made of the assets that Mr. Steffelin was

7     applying for a job at Magnetar?

8          MR. LIPMAN:  He was not applying for a job at

9     Magnetar.  He was talking about starting a new collateral

10    manager, which made him not conflicted because according to the

11    complaint's allegations, what they were talking about --

12         THE COURT:  You are telling me that he was not

13    applying for a job at Magnetar?

14         MR. LIPMAN:  No, he was not applying for a job at

15    Magnetar.  He was talking to Magnetar.

16         THE COURT:  That is a factual issue.

17         MR. LIPMAN:  No, your Honor.  It is in the complaint.

18    It is in the complaint.  It is in the complaint.

19         THE COURT:  It is still a factual issue.  We don't

20    normally dismiss complaints facts without evidence.

21         MR. LIPMAN:  Your Honor, assuming the complaint

22    allegations is true, he was talking to Magnetar about starting

23    a new collateral manager and moving all of the deals, including

24    this deal, into that collateral manager.  That is according to

25    complaint.  I am not asking the Court to look at anything else.

1    According to the complaint.

2              THE COURT:  He was seeking Magnetar's support for

3    something is what you are telling me.

4              MR. LIPMAN:  He and Magnetar were talking about

5    starting a new collateral manager.  Engaging in the same

6    business -- collateral managers, your Honor, get paid from fees

7    thrown off from these deals.

8              THE COURT:  I understand.

9              MR. LIPMAN:  So he was not conflicted.

10             THE COURT:  Just a moment.  Just a moment.

11             MR. LIPMAN:  Yes.

12             THE COURT:  He had an interest in pleasing Magnetar at

13   that time.  That is what a conflict of interest is.

14             MR. LIPMAN:  Your Honor, I don't think he did, but

15   even if he did, that was long gone by the time the CDO SPVs

16   were even created.

17             THE COURT:  I was just told the contrary.

18             MR. LIPMAN:  Your Honor, Ms. Folena should have been

19   corrected you.  The relevant question is not when the pitch

20   book was created because that was this March.  The relevant

21   question is when were the CDOs SPVs created.  That was April 5

22   and 10th.  The next relevant question is when did they acquire

23   interest.  That was when they were capitalized and that didn't

24   happen until May 11th.  By the way, the pitch book never went

25   to the --

1ao6ussc

```
 1            THE COURT:  Once they were selected, they were

 2    selected.  When were they selected?

 3            MR. LIPMAN:  There was definitely an overlap between

 4    the discussions about starting a new collateral manager and

 5    asset selection.  However, to the extent there is any conflict,

 6    the conflict is about whether there would be divided loyalties.

 7    He never advised the CDO SPvs.

 8            THE COURT:  Just a moment.  When you talk about

 9    divided loyalties, the question is was he motivated to please

10    Magnetar.  Isn't that really what we're talking about?

11            MR. LIPMAN:  Your Honor, even if I accept for purposes

12    of argument that he was motivated to please Magnetar, what I am

13    saying is that motivation was irrelevant.

14            THE COURT:  Why?  How can it be irrelevant that he

15    wanted to please Magnetar?

16            MR. LIPMAN:  He was not under any obligation either

17    statutory or fiduciary or any other obligation to select the

18    portfolio in any particular way.

19            THE COURT:  Oh, please.

20            MR. LIPMAN:  Your Honor, the question is was he

21    influenced in any way particular way, not whether he was

22    obligated to be influenced.

23            Your Honor, the CDOs SPVs didn't exist and they were

24    created for the sole reason -- let me just say this:  We cite

25    to your Honor a Judge Kaplan opinion that deals with CDO SPVs,
```

1ao6ussc

1   the KPMG case.  What Judge Kaplan says is that SPVs are

2   created -- they are endowed by their creators with certain

3   rights and their creators are the people who set them up and

4   they set them up for the purposes of a particular deal.  In

5   this case J P Morgan created these SPVs specifically to receive

6   these assets.  Mr. Steffelin didn't have any obligations to the

7   SPVs.  Also, they didn't have any choice.  The SPVs were

8   created by J P Morgan to the extent duties existed.

9          Two more things, and I am sorry to do this, there are

10  a couple things I want to get back to.

11          THE COURT:  I gave you ample time.

12          MR. LIPMAN:  Your Honor, you did, but unfortunately

13  where we are -- just to two quick things because it is

14  relevant.  The J P more man represented, and it is in our

15  brief, to Mr. Steffelin that all of the disclosures in the

16  offering circular are true and complete in all material

17  respects.

18          THE COURT:  Please.  We're really now just going

19  around in a circle.  The question is whether he should have

20  disclosed that he had a special interest in pleasing Magnetar.

21          MR. LIPMAN:  There was none to disclose to.

22          THE COURT:  Just a moment.  Just a moment.  Of course

23  there was someone to disclose to, but that is not the point.

24  It is a very close question, but I will not dismiss the

25  complaint on the theory that at that time he had no conflict.

1ao6ussc

```
 1          MS. FOLENA:  May I answer the timing question that

 2   your Honor asked 15 minutes ago?

 3          The timing is this:  During the time Mr. Steffelin is

 4   engaging in discussions with Magnetar about listings a portion

 5   of his group, including himself, from GSC to go to Magnetar,

 6   inside the Magnetar entity, is January 5th through

 7   February 26th, 2007 approximately.  During that time period is

 8   what is referenced in the complaint as Phase II of the asset

 9   selection process.  During that phase, 19 assets are put into

10   the portfolio and 18 of them are selected by Magnetar.  There

11   is absolutely sufficient evidence.

12          THE COURT:  I have ruled.  We don't need postruling

13   arguments.

14          MS. FOLENA:  Thank you, your Honor.

15          MR. LIPMAN:  Your Honor, I hear that your Honor has

16   ruled.  I just want to make two quick points.  One, all of the

17   assets were acquired at a market price.  Nothing other than a

18   market price.

19          THE COURT:  When you try this case, you will show all

20   that.

21          MR. LIPMAN:  Number two, the offering circular has a

22   disclosure.  I didn't realize your Honor was going to rule

23   without giving me a chance to come back.  And frankly, your

24   Honor, I would ask the Court to reconsider because among other

25   things the offering circular --
```

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1ao6ussc

```
 1            THE COURT:  I do not rule lightly.  I listened to you

 2    for a very long time and I have piles of paper here that have

 3    been read.

 4            MR. LIPMAN:  Your Honor, we said in our brief, and we

 5    described this, there is a disclosure the offering circular

 6    that says noteholders like Magnetar, and it doesn't name

 7    Magnetar by name, noteholders short portfolio assets into the

 8    portfolio and when doing so that would do that and exercise

 9    their rights without regard to how those rights would impact

10    other noteholders or the portfolio as a whole.  That disclosure

11    is a complete disclosure of Magnetar's role in this deal and

12    that disclosure is in the offering circular.  So we're not

13    talking about the offering circular because it is not charged,

14    but that is why it is not charged, your Honor.

15            One last thing, and I do ask the Court to reconsider,

16    and here is why, and I know that the Court doesn't make

17    decisions lightly, your Honor, this is not his statement.  Even

18    if you are right that the pitch book needed to say something

19    else, it is not his statement.  He didn't put it together.  He

20    did not use it.  He answered the questions that J P Morgan

21    asked.  He answered them honestly.  There is no question that

22    that is true.  It said nothing about sourcing the assets.  J P

23    Morgan knew that.

24            THE COURT:  This case is not over.  It is just

25    starting.
```

1ao6ussc

1          MR. LIPMAN:  Your Honor, the problem with this case

2     from the beginning has been that this case was about one thing:

3     This cause was about getting on the front page of the Wall

4     Street Journal.

5          THE COURT:  I cannot get drawn into ad hominem

6     attracts.

7          MR. LIPMAN:  Your Honor, a direct quote from the SEC

8     to counsel for Mr. Steffelin after we said we weren't

9     interested in going away was, Do you really want your client to

10    be the poster child of the J P Morgan CDO fraud?  That is

11    outrageous.

12         THE COURT:  Look, I am not ruling on anything that

13    anybody should or should not have done outside of this

14    complaint.

15         MR. LIPMAN:  I understand, your Honor.  All I am

16    saying is that the offering circular was complete, it has

17    relevant disclosure, the pitch book was complete and it wasn't

18    his statement.  The conflict was long extinguished by the time

19    he needed to say anything.

20         THE COURT:  I have been very patient.  I gave you a

21    lot of time to be heard.  We've reached the end of the

22    argument.

23         MR. LIPMAN:  Yes, your Honor.

24         THE COURT:  Very well.

25         MS. FOLENA:  Thank you, your Honor.

1          MR. LIPMAN:  Thank you, your Honor.

2                              o0o

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25